IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


David L. Royer,                    :

          Plaintiff,               :

     v.                            :    Case No. 2:05-cv-1134

Tigerpoly Manufacturing, Inc.,     :    MAGISTRATE JUDGE KEMP

          Defendant.               :

OPINION AND ORDER

     This matter is before the Court on a motion for summary
judgment filed by the defendant, Tigerpoly Manufacturing, Inc.
("Tigerpoly").  For the following reasons, the motion will be
granted in part, and Mr. Royer's intentional tort claim will be
dismissed.  The FMLA claim, however, survives the motion.

I.

     Tigerpoly is a manufacturing company in Grove City, Ohio that
makes injection molded parts for automobiles.  The plaintiff, David
Royer, was a maintenance technician for Tigerpoly.  His duties
included, *inter alia*, general maintenance work, removing safety
hazards and cleaning up spills.

     On November 19, 2003, Mr. Royer was told to change the oil in
a trash compactor.  To do so, he had to drain the old oil out of
the compactor and replace it with new oil.  All used and unused oil
was located in the Flammable Storage Building ("FSB"), which is a
small building located just outside the main Tigerpoly facility.
Inside the FSB, near the entrance, was a concrete hump in the
floor.  In other words, the floor of the building was not
completely level.

     Mr. Royer went to the FSB to get the oil to perform his task.
He obtained approximately twenty gallons of oil from several

different 55-gallon steel drums that were nearly empty. Then, to get the remaining five gallons necessary, Mr. Royer pulled out a full 55-gallon drum. He had to move the full 55-gallon drum over the hump to extract the oil. Once Mr. Royer got the oil he needed from that drum, he tried to pull the nearly full drum back into the FSB. During this effort, he slipped on some spilled oil and fell backwards into another drum. Mr. Royer told his supervisor, Mike Hinty, and his Senior Technician, Jack Rhodes, that he slipped on oil in the FSB and hit his back. However, he finished his shift that day.

The next day, November 20, 2003, Mr. Royer appeared for work but left early because of pain in his back allegedly due to his fall in the FSB. Before he left, Mr. Royer informed Mr. Rhodes of his back pain and said that he would not be at work the next day because he was going to go see a doctor.

On November 21, 2003, Mr. Royer visited a doctor, and, after the visit, left Mr. Hinty a voicemail stating that he would not be at work that day. Mr. Royer also told Mr. Hinty that the doctor wrote a note indicating that Mr. Royer should not work for two weeks. However, Mr. Royer may also have said, in the same voicemail, that he would likely return to work on November 24, 2003.

Mr. Royer did not report for work or call regarding his absence on November 24, 2003. Messrs. Rhodes and Hinty and Ms. Watts called Mr. Royer at home to inquire about his absence. Mr. Royer claims that Ms. Watts fired him that day but later rescinded the termination when it was discovered that his absence was for medical reasons. Mr. Royer did tell Tigerpoly on November 24, 2003 that he would not return to work until December 1, 2003 pursuant to doctor's orders. Tigerpoly provided Mr. Royer with Family Medical Leave Act paperwork for his doctor to complete.

Mr. Royer's physician, Dr. Brian Pachmayer, sent a note to Ms.

2

Watts on November 25, 2003, which stated that Mr. Royer was "off
work til 11/24-11/30 Return Monday 11/30 Seen 11/21 + 11/24 with
employers ok - to see urologist Has CT 12/10/03" (Dep. of Judith
Watts, Ex. 11).   Further, on December 3, 2003, Dr. Pachmayer
completed the "Physician Certification for Family or Medical
Leave." (Id. at Ex. 13).  The form asked the physician to fill in
this statement (among others):

> As a result of this condition, it is my
> opinion that:
> __ The Associate is currently unavailable to
> perform his/her job.
> __ The Associate is currently needed to care
> for his/her spouse, child, parent.
> __ Intermittent leave is medically necessary
> for the Associate.
> __ Intermittent leave is medically necessary
> for the Associate to care for his/her spouse,
> child, parent.
> __ None of the above.

(Id. at p. 2) Dr. Pachmayer selected "None of the Above" and wrote
"May due [sic] light duty until back specialist sees him." (Id.)
The "Physician Certification" also indicated that Mr. Royer was not
excused for any more days of work.

Ms. Watts sent Mr. Royer a "Response to Request for
Family/Medical Leave" on December 9, 2003, stating that Mr. Royer
was not eligible for FMLA leave because

> [y]our physician of record, Dr. Brian
> Pachmayer, stated on the FMLA forms that he
> completed for you that you did not need family
> medical leave.  He indicated light duty only
> until you see a specialist.  The specialist
> will determine at that time what course of
> action should be taken, indicating whether or
> not light duty should be continued.

(Reply to Defendants' Mot. for Summ. Judg., Ex. 2).

Tigerpoly has an established attendance policy based on
"occurrence points" for absences.  The policy states, in relevant

3

part:

**Attendance Standards:**

The attendance standards are based on a **No-Fault Occurrence Program.** An absence occurrence is defined as one or more consecutive days of absence for personal illness other than the following. All other absences are counted as singular days and individual occurrences of absenteeism.

(a) FMLA - Family Medical Leave
(b) Subpoena
(c) Earned Vacation
(d) Earned Free Day
(e) Jury Duty
(f) Death in the Immediate Family
(g) Marriage Leave
(h) Military Leave
(I) Workers' Compensation
(j) Natural disaster as determined by the President of Tigerpoly.

**Points Associated With Occurrences of Absenteeism:**
(All guidelines apply to eight (8) hour shifts)

• One or more consecutive days of absence for a medical reason = 1 point
• Tardy - 1 hour or less = 1/4 point
• Tardy - 1 to 4 hours = ½ point
• Tardy more than 4 hours = 1 point
• Leave early - 1 hour or less = 1/4 point
• Leave early - 1 to 4 hours = ½ point
• Leave early - 4 hours or more = 1 point
• No-call-no-show = 2 points for each day
•
**Counseling & Discipline:**

The No-Fault program is based on a maximum of six (6) occurrences in any rolling twelve month period as follows:

• 3 occurrences - verbal counseling with notation in file
• 4 occurrences - written warning

4

- 5 occurrences - final written warning
- 6 occurrences - discharge
- 2 consecutive no-call-no-shows
- - voluntary termination of employment

(Dep. of Judith Watts, Ex. 1). Mr. Royer accumulated 2.5 points prior to his injury in November 2003. Thus, because his November absences resulting from the fall in the FSB were not deemed covered by the FMLA, he was assessed additional points. When he did not report for work or call off sick on January 12, 2004, Mr. Royer was assessed additional points. Because he had accumulated 7.5 points in a twelve-month period, his employment was then terminated.

II.

Fed. R. Civ. P. 56(c) provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)(emphasis in original); Kendall v. The Hoover Co., 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 477 U.S. at 248. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only

where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is,...[and where] no genuine issue remains for trial,...[for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464, 467 (1962); accord, County of Oakland v. City of Berkley, 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for a directed verdict. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Anderson, 477 U.S. at 250.

> The primary difference between the two motions is procedural: summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted. Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 745, n. 11 (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex, 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970) (footnote omitted); accord, Adams v. Union Carbide Corp., 737 F.2d 1453, 1455-56 (6th Cir.1984), cert. denied, 469 U.S. 1062 (1985). Inferences to be drawn from the underlying facts contained in such

6

materials must be considered in the light most favorable to the party opposing the motion. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962); <u>Watkins v. Northwestern Ohio Tractor Pullers Association, Inc.</u>, 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. <u>Adickes</u>, 398 U.S. at 157-60; <u>Smith v. Hudson</u>, 600 F.2d 60, 65 (6th Cir.1979).

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. <u>Anderson</u>, 477 U.S. at 251. As is provided in Fed. R. Civ. P. 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Thus, "a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253, 259 (1968)(footnote omitted).

### III.

Mr. Royer alleges two separate claims in his complaint. In his first claim, Mr. Royer argues that Tigerpoly illegally

7

discharged him for using FMLA leave.  In the second claim, Mr. Royer contends that Tigerpoly committed an intentional tort in violation of Ohio law because it knew or should have known about the oil on the floor in the FSB when he was injured.  The Court will address the intentional tort allegation first.

A. *Employer Intentional Tort*

Generally, in Ohio, employees who are injured in the course of their employment are limited to the remedial measures outlined by the Ohio Workers' Compensation Act.  <u>See</u> O. Const. II § 35.  There are certain instances, however, where an employee may seek recovery outside of the Act.  For example, an employee may recover outside Ohio workers' compensation laws if an employer commits an intentional tort.  <u>See</u>, <u>e.g.</u>, <u>Blankenship v. Cincinnati Milacron Chemicals, Inc.</u>, 69 Ohio St.2d 608 (1982)(employee may sue employer for intentional tort outside the remedial measures of workers' compensation).

In order to establish "intent" for the purposes of determining whether an employer committed an intentional tort, a plaintiff must prove:

> (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;
>
> (2) knowledge by the employer that if the employee is subjected by his employment to such a dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and
>
> (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

<u>Fyffe v. Jeno's</u>, 59 Ohio St.3d 115, 118 (1991).[1]

*Knowledge of a Dangerous Procedure*

<u>Fyffe</u> first requires the employee to establish that the employer possessed knowledge of a dangerous process, procedure, instrumentality or condition within its business operations. In order to satisfy this prong, the employee must show that (1) a dangerous condition existed within the employee's business operations and (2) that the employer had knowledge that the dangerous condition existed. <u>See</u>, <u>e.g.</u>, <u>Dailey v. Eaton Corp.</u>, 138 Ohio App.3d 575, 581-82 (3d Dist. 2000). Dangerous work is different than a dangerous condition, and it is the latter that is the focus of this inquiry. <u>Id.</u> Additionally, "the 'dangerous condition' at issue must be one which falls outside the 'natural hazards of employment,' which one assumes have been taken into consideration by employers when promulgating safety regulations and procedures." <u>Youngbird v. Whirlpool Corp.</u>, 99 Ohio App.3d 740, 474 (1994). This is not the "reasonable person" standard associated with determining negligence or recklessness; rather, an employee must prove that the employer had actual knowledge of a dangerous process, procedure, instrumentality or condition within its business operations.

_____

[1] As numerous courts have noted, Ohio Rev. Code § 2745.01 abrogated <u>Fyffe</u>, effective October 20, 1993. That legislation intended to override the standard enunciated <u>Fyffe</u> to make it more difficult for an employee to succeed in an employer intentional tort claim. The Ohio Supreme Court, however, determined that Ohio Rev. Code § 2745.01 was unconstitutional and reinstated <u>Fyffe</u>. <u>Johnson v. B.P. Chemicals, Inc.</u>, 85 Ohio St.3d 298, 308 (1999)("Because R.C. 2745.01 imposes excessive standards (deliberate and intentional act), with a heightened burden of proof (clear and convincing evidence), it is clearly not a law that furthers the ... comfort, health, safety, and general welfare of all employees)(internal quotations omitted). In response to <u>Johnson</u>, the Ohio legislature revised Ohio Rev. Code § 2745.01, effective April 4, 2005. Because the alleged injury in this case occurred in 2003, there are no controlling statutes, and <u>Fyffe</u> and its progeny control.

In the instant case, Mr. Royer offers several depositions and an affidavit in support of his position that a genuine issue of material fact exists with respect to this issue.  First, George Popovic, a senior technician and maintenance technician, stated, *inter alia*, in affidavit:

> Prior to November 2003, in performing my duties, I would go out into the [FSB] three to four times a week to dispose of oil and retrieve new oil.  During that time period, there was almost always oil on the floor and it was generally one-half (.5) inch deep tapering to a coating of oil.  Additionally, the floor was not level and because of that the oil would puddle in the corners of the [FSB].
>
> Prior to November 2003, there was no system or set dates to clean the [FSB] and there was no log or record for determining whether the [FSB] needed cleaning.  During that time, even though the oil house floor was almost always covered with oil, the Maintenance Technicians would only be assigned by Mike Hinty to clean the floor of the oil house at the most twice a year, during bi-annual plant shut down periods in July and December.  Moreover, during that time period, many times when the Maintenance Technicians were assigned by Mike Hinty to clean the [FSB] it was not completed because we lacked sufficient staffing.
>
> Before [Mr. Royer] was injured, everyone knew that the [FSB] needed to clean the building out [sic].  It was common knowledge that the [FSB] needed maintenance because of the oil that was almost always on the floor.  Mike Hinty, Maintenance Supervisor, said on several occasions that the oil room needed to be cleaned.  Additionally, during the bi-annual shut down periods Mike Hinty would assign us the duty of cleaning the [FSB].  However, even though it was assigned, many times we were unable to complete the cleaning of the [FSB] because we were short staffed.  Additionally, during these occasions, Mike Hinty knew that

10

we were unable to complete the cleaning of the
[FSB].

(Aff. of George Popovic, ¶¶ 8-10).  Second, Jack Rhodes, a senior
technician, stated, *inter alia*, in his deposition:

> Q. Back in October or November 2003, do you
> know whether or not there was any oil on the
> floor of the [FSB]?
>
> A. I can't remember, but I do remember an
> instance that I had said at a shift change
> meeting - The day before I went in there for
> something, and there was oil on the floor.  I
> came to the shift change meeting, basically
> told the guys, "Look, this is an accident
> waiting to happen out here.  Are we going to
> continue walking in there or are we going to
> get this cleaned up?"  I was pretty upset at
> the state of the building.
>
> Q. When you were saying you were telling the
> guys, which guys are you referring to?
>
> A. The maintenance staff at a shift change.
>
> ***
>
> Q. So safety solvents are stored in [the FSB],
> and sometimes you'll go out there and get
> those?
>
> A. Yes.
>
> Q. And other times you go out there to
> dispense of used oil; is that correct?
>
> A. Yes.
>
> Q. In the past, how often have you gone out
> there and seen oil on the floor?
>
> A. There have been occasions.  I can't give
> you an exact number.
>
> Q. Was it more often than not when you went
> out there?  Was it the majority of the time
> you saw oil?

11

A. Recently, the past few years, it's a
rarity. I can't really recall seeing any oil
on the floor recently.

Q. But before that, before the recent history,
was it more often? Is that what you're
saying?

A. The one time that I told you about, yes, it
was very bad, and guys have been better at
keeping that cleared up.

A. What about before that, before the past
couple of years, because you said recently
it's been pretty clean.

A. Yeah.

Q. Before that then it was it like every other
time you went there or any idea of - just more
often than it is now?

A. I couldn't give you an exact amount of
times that there was oil on the floor. I
didn't go out there a lot, to be honest with
you. In my position, I don't really have to.
But the times I did and it was in disarray or
dirty, I would mention it and let the guys
know they need to do a little better job on
their clean-up.

Q. But at least recently now it has been
better?

A. Yes, the few times I have been out
recently, I haven't noticed any problems. If
I didn't notice, then I would say it is okay.
That's one of my pet peeves is oil. I don't
like it on me, and I definitely don't like
walking in it, so I would have definitely
noticed.

(Dep. of Jack Rhodes at pp. 14-17). Finally, Mr. Royer testified:

Q. Also in paragraph five [of the complaint],
you allege that the oil had been a constant
problem for many months? What do you mean by a
constant problem?

12

A. Guys go in there dumping waste oil and
wouldn't hit the bucket.  They wouldn't put
the funnel in there.  It runs off the side and
runs on the floor.

Q. So the oil that you slipped on had
accumulated gradually as more and more got
spilled.

A. Yes. Disposing of waste.

Q. I guess what I wanted to clarify was the
way it reads here, if [sic] sounds like the
oil was spilled once and then was a constant
problem from there on.

   From what you're telling me, there's spill
one time [sic] and then didn't get cleaned up
and spill again and spill again several times
[sic].  And then by the time you slipped on
it, it had increased each spill?

A. Yes.

Q. Okay.  I'm just trying to get a sense of
whether it was a one-time spill that was the
constant problem or this series of spills.

   Did you personally bring the presence of
the oil to anyone's attention during the
months that it was present?

A. I talked to Jack Rhodes about it before
then.

Q. Do you recall what the reason was or the -
any more details about what you told Jack?

A. Because there was a lot of oil on the
floor.

Q. About when would this have been?

A. During shutdown they cleaned the machines,
all around the machines.  The machines leak
quite a bit.  They are old.  So he told me,
yeah, that's on the list to get cleaned up at
Christmastime.  And then Keith had mentioned

13

it. So there had been discussions of it.

Q. Where these one-on-one with Jack Rhodes?

A. Yes.

(Dep. of David Royer at pp. 167-69). Viewing the evidence in a light most favorable to Mr. Royer, it appears that there is evidence that Tigerpoly knew that, prior to Mr. Royer's alleged fall, there was substantial oil on the floor in the FSB room. There is some authority for the proposition that the presence of slippery materials on a floor near an unguarded hazard is the type of dangerous condition that satisfies the first prong of the Fyffe test. See, e.g., Brookover v. Flexmag Industries, Inc., No. OOCA49, 2002-Ohio-2404, ¶108 (4th Dist. April 29, 2002) ("Additionally, the record reveals that appellant knew of the extremely slippery condition of the floor. Thus, in light of the fact that appellant knew that employees worked on a slippery floor surface near an unguarded, inrunning nip point, a reasonable jury could conclude that appellant had knowledge of a dangerous condition, beyond the natural hazards associated with appellee's employment, within its business operations"). The question then becomes whether this same analysis applies to a slippery floor that is, itself, the dangerous condition which purportedly satisfies this part of the Fyffe test.

In contrast, this case involves only a slippery floor in an oil storage area. Any business that maintains a supply of lubricants may experience a slippery floor from time to time. Slipping in oil in such an environment would seem to be a natural hazard associated with a business such as Tigerpoly's, especially when the type of injury that may occur is a typical "slip and fall" injury as opposed to an injury caused by exposure to an additional hazard such as an unguarded nip point. The Court is therefore skeptical that the dangerous condition which existed in the FSB was

14

of a character which satisfies the first prong of the <u>Fyffe</u> test.
Nevertheless, the Court will assume, for purposes of discussion,
that a jury could reach the opposite conclusion. That assumption
does not alter the outcome of this case because, for the following
reasons, the Court finds that no genuine issues of material fact
exist with respect to the second prong of the <u>Fyffe</u> test.

*Substantial Certainty*

<u>Fyffe's</u> second prong requires the employee to prove that the
employer had knowledge that if the employee were subjected to the
dangerous process, procedure, instrumentality, or condition, then
harm to the employee was a substantial certainty. <u>Fyffe</u>, 59 Ohio
St.3d at 118. An employee, however, cannot prove substantial
certainty by demonstrating negligence or recklessness. <u>Id.</u>
Instead, the employee must prove more:

> To establish an intentional tort of an
> employer, proof beyond that required to prove
> negligence and beyond that to prove
> recklessness must be established. Where the
> employer acts despite his knowledge of some
> risk, his conduct may be negligence. As the
> probability increases that particular
> consequences may follow, then the employer's
> conduct may be characterized as recklessness.
> As the probability that the consequence will
> follow further increases, and the employer
> knows that injuries to employees are certain
> or substantially certain to result from the
> process, procedure or condition and he still
> proceeds, he is treated by the law as if he
> had in fact desired to produce the result.
> However, the mere knowledge and appreciation
> of a risk - something short of substantial
> certainty - is not intent.

<u>Id.</u> As the Sixth Circuit Court of Appeals noted, a plaintiff must
show "that the employer '(1) specifically desired to injure the
employee; or (2) knew that injury to an employee was certain or
substantially certain to result from the employer's act, and
despite this knowledge, still proceeded.'" <u>Jandro v. Ohio Edison</u>

15

Co., 167 F.3d 309, 313 (6th Cir.1999)(citing Mitchell v. Lawson Milk Co., 40 Ohio St.3d 190, 193 (1988)).

The substantial certainty standard is a difficult one to satisfy. McGee v. Goodyear Atomic Corp., 103 Ohio App.3d 236, 246 (4th Dist.1995); Moore v. Ohio Valley Coal Co., No. 05BE3, 2007-Ohio-1123, ¶34 (7th Dist. March 7, 2007); Arnold v. Ebel, No. 06CA52, 2007-Ohio-479, ¶16 (5th Dist. Feb. 6, 2007); Renwand v. Brush Wellman, Inc., 149 Ohio App.3d 692, 697 (8th Dist.2002). An employee may establish substantial certainty through direct or circumstantial evidence. Hannah v. Dayton Power & Light Co., 82 Ohio St.3d 482, 485 (1998). This includes evidence of prior accidents, which, without such, makes it very difficult for the employee to prove substantial certainty. Taulbee v. Adience, Inc., BMI Div., 120 Ohio App.3d 11, 20 (10th Dist. 1997) ("Establishing the employer's knowledge of substantial certainty of harm is difficult where there are no prior accidents of similar character, but a lack of prior accidents is not necessarily fatal to the plaintiff's case"); Faust v. Magnum Restaurants, Inc., 97 Ohio App.3d 451, 455 (10th Dist. 1994)("Evidence of prior accidents involving the procedure at issue is one factor to be considered under the *Fyffe* analysis. While such evidence, standing alone, may not be conclusive, it strongly suggests ... that injury from the procedure was not substantially certain to result from the manner in which the job was performed")(internal citation omitted). To determine whether an employer had knowledge that the dangerous condition was substantially certain to cause injury, however, the focus is not only on how often similar accidents occurred but also on the employer's knowledge of the degree of risk involved. Taulbee, 120 Ohio App.3d at 21.

The Court concludes that this case is similar to Faust. In Faust, a restaurant employee was injured while disposing of grease from fryer vats. While carrying the vats of grease to the

16

disposal, without a lid and while hot, the employee slipped and
dumped the hot grease on himself. There was evidence that the
employee was not, at the time of the accident, wearing the safety
material provided. The employee sued for an intentional tort but
the court rejected his claim stating that <u>Fyffe's</u> second prong was
not satisfied:

> In the present case, it was undisputed that
> the procedure had been performed "thousands of
> times" without prior accident. The evidence
> indicated that Faust himself had performed the
> procedure over one hundred times during the
> course of a year without incident.
>
> Construing the evidence most strongly in favor
> of plaintiffs, there was evidence of a lack of
> uniform application of the use of safety
> equipment in disposing of the hot oil, and
> evidence that management knew that the
> employees were not always wearing the
> equipment. However, while defendants' failure
> to ensure that the employees were, at all
> times, using the available safety equipment
> might indicate negligence, or even
> recklessness, such actions fall short of the
> higher standard of substantial certainty. The
> mere knowledge and appreciation of a risk does
> not constitute intent.

<u>Faust</u>, 97 Ohio App.3d at 456.

In the instant case, there appears to be no evidence regarding
similar injury accidents in the FSB due to the oil on the ground.
According to Mr. Royer's testimony:

> Q. Did you express to anyone at Tigerpoly that
> you did not want to perform any tasks that
> involved taking oil out of the [FSB] before
> your accident?
>
> A. No.
>
> Q. Are you aware of anyone other than yourself
> who was injured taking oil in or out of the
> [FSB]?

17

A. No.

Q. Are you aware of anybody other than yourself who was injured by slipping and falling on oil at Tigerpoly?

A. No.

***

Q. Are you aware of anyone else who actually slipped while moving a drum into or out of the [FSB]?

A. No.

Q. Are you aware of anyone else who almost slipped while moving a drum into or out of the [FSB]?

A. No.

***

Q. Okay. Prior to you being injured, no one else was injured slipping on that oil, is that correct, to your knowledge?

A. To my knowledge, no.

Q. Do you have any reason to think that anyone at Tigerpoly knew you would be injured given that no one else had ever been injured in that way?

A. No.

(Dep. of David Royer at pp. 173, 176-77, 179-80). In fact, the only evidence of Tigerpoly employees slipping on oil occurred in other parts of the Tigerpoly facility. (See Dep. of Judith Watts, Exs. 24-33).

Like Faust, the Court notes that employees like Mr. Royer went into the FSB on a daily basis to dispose of and obtain oil, as well as other industrial substances. For example, as indicated, *supra*,

Mr. Popovic stated, "[p]rior to November 2003, in performing my
duties, I would go into the [FSB] three to four times a week to
dispense of oil and retrieve new oil." (Aff. of George Popovic at
¶ 8). Additionally, Mr. Rhodes stated:

> Q. So safety solvents are stored in the [FSB],
> and sometimes you'll go out there and get
> those?
>
> A. Yes.
>
> Q. And other times you go out [to the FSB] to
> dispense of used oil; is that correct?
>
> A. Yes.

(Dep. of Jack Rhodes at p. 16). Given the amount of interaction
all Tigerpoly employees, including Mr. Royer, had with the alleged
constant oil on the floor in the FSB, combined with the fact that
there appears to be no report of accidents due to that oil on the
floor in the FSB, this Court simply concludes, as a matter of law,
that injury to employees, including Mr. Royer, in the FSB because
of the oil on the floor was not a substantial certainty. The facts
which are not in dispute demonstrate that Tigerpoly's employees
walked in and out of the FSB on a daily basis but rarely, if ever,
slipped on the oil on the floor and injured themselves. A few
isolated instances of employees slipping on the floor at other
locations within the plant do not change this result.

On of the deposed witnesses, Mr. Rhodes, testified that the
FSB was an "accident waiting to happen." Such a statement may be
evidence of negligence or even recklessness, but it does not rise
to the level of substantial certainty. While such a statement may
assist in proving <u>Fyffe's</u> first prong, it is insufficient to prove
substantial certainty. <u>See</u> <u>Faust</u>, 97 Ohio App.3d at 457 ("Finally,
we note that plaintiffs have cited portions of an operations
manual, which provides in part that '[f]iltering fryers is perhaps
the most dangerous job in the restaurant." Such evidence regarding

19

the dangerous nature of the procedure, while going to the first element of the *Fyffe* test, is likewise insufficient to satisfy the requirement of substantial certainty.").

Finally, the Court notes Mr. Royer's own testimony that indicated he did not think he would be injured in the FSB. The record states:

> Q. Do you have any reason to think that anyone at Tigerpoly knew you would be injured given that no one else had ever been injured in that way?
>
> A. No.

(Dep. of David Royer at p. 180). If Mr. Royer failed to believe that he was going to be injured moving oil drums on a slick floor in the FSB, it is difficult for the Court to conclude that Tigerpoly knew with a substantial certainty that he would be.

Accordingly, no genuine issues of material fact exist regarding the second prong of <u>Fyffe</u>. As a matter of law, Mr. Royer cannot prove knowledge by Tigerpoly that if Mr. Royer was subjected to the oil on the floor in the FSB, then harm to Mr. Royer would be substantially certain. Because all three <u>Fyffe</u> elements must be satisfied, the Court need not address the third prong, and summary judgment on the employer intentional tort claim is appropriate.

### B. *FMLA*

The FMLA claim turns on the correct characterization of the November days which Mr. Royer missed due to his injury in the FSB. It is uncontested that, prior to Mr. Royer's accident on November 19, 2003, he had accumulated 2.5 points. It is also undisputed that Mr. Royer received two no-call-no-show points on January 12, 2004, for a total of 4.5 points. Under Tigerpoly policy, if an employee receives 6 or more occurrence points in any rolling twelve-month period, the employee is terminated. Therefore, if any of November 20, 21 and 24 were are not FMLA-protected days, those

days would properly count toward Mr. Royer's accumulated points. It is not disputed that by counting any of those days, Mr. Royer's point total would have exceeded the maximum allowed and the termination would be justified. On the other hand, if the days were FMLA-protected, the termination was improper.

Tigerpoly claims that Mr. Royer's November absences were not FMLA-protected because he "never provided Tigerpoly with the required medical certification that he was entitled to FMLA leave due to a 'serious health condition.'" (Def. Mot. for Summ. Judg. at p. 12). Specifically, Tigerpoly argues that Dr. Pachmayer's note and completion of Tigerpoly's "Physician Certification for Family or Medical Leave" were insufficient to establish that Mr. Royer had a "serious medical condition." In response, Mr. Royer contends that he provided Tigerpoly with proper notice of his serious medical condition and was terminated because he exercised FMLA-protected rights.

The FMLA entitles qualified employees to twelve weeks of unpaid leave each year if, among other things, an employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A serious health condition is one which requires "impatient care in a hospital, hospice, or residential medical care facility" or continuing treatment by a health care provider. 29 U.S.C. § 2911(11). Under the FMLA, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). Employers who violate this section are "liable to any eligible employee affected" for damages and "for such equitable relief as may be appropriate." 29 U.S.C. § 2617(a)(1).

To prevail on a claim for denial of FMLA-protected rights under § 2615, a plaintiff must prove that (1) he is an eligible

21

employee, 29 U.S.C. § 2611(2); (2) the defendant is an employer, 29 U.S.C. § 2611(4); (3) the employee was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of his intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the employee FMLA benefits to which he was entitled.  <u>Cavin v. Honda of America Mfg. Inc.</u>, 346 F.3d 713, 719 (6th Cir.2003).  It is undisputed in the record that Mr. Royer was an "eligible employee" and Tigerpoly was an "employer" within the definition of the Act.

In order to be entitled to take leave, the FMLA allows an employer to require sufficient certification by the health care provider that the employee has a serious medical condition.  29 U.S.C. § 2913(a).  For purposes of FMLA, "sufficient certification" means:

> Certification provided under subsection (a) of this section shall be sufficient if it states:
>
> (1) the date on which the serious health condition commenced;
>
> (2) the probable duration of the condition;
>
> (3) the appropriate medical facts within the knowledge of the healthcare provider regarding the condition; [and]
>
> (4) for purposes of leave under section 2612(a)(1)(D) of this title, a statement that the employee is unable to perform the functions of the position of the employee ...

29 U.S.C. § 2613(b)(1)-(4)(B).

> An employee shall provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave.  The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed for an expected birth or adoption, for

22

> example.  The employer should inquire further
> of the employee, and obtain the necessary
> details of the leave to be taken.  In the case
> of medical conditions, the employer may find
> it necessary to inquire further to determine
> if the leave is because of a serious health
> condition and may request medical
> certification to support the need for such
> leave ... .
>
> An employer may also require an employee to
> comply with the employer's usual and customary
> notice and procedural requirements for
> requesting leave.  ... However, failure to
> follow such internal employer procedures will
> not permit an employer to disallow or delay an
> employee's taking FMLA leave if the employee
> gives timely verbal or other notice.

29 C.F.R. § 825.302(c)-(d).

Here, as noted above, Mr. Royer was injured on Wednesday, November 19, 2003.  The next day, Thursday, November 20, 2003, Mr. Royer reported for work but left early allegedly due to back pain resulting from his fall the previous day.  On Friday, November 21, 2003, Mr. Royer visited a doctor, and, after the visit, left Mr. Hinty a voicemail stating that he would not be at work that day. Additionally, Mr. Royer informed Mr. Hinty that the doctor wrote a note indicating that Mr. Royer should not work for two weeks. Evidence provided by Tigerpoly demonstrates, however, that Mr. Royer indicated in his voicemail that he would likely return to work on Monday, November 24, 2003.

Mr. Royer did not report for work or call regarding his absence on Monday, November 24, 2003.  In response, Messrs. Rhodes and Hinty and Ms. Watts called Mr. Royer at home to inquire about his absence.  At that time, Mr. Royer claims that Ms. Watts terminated him because he missed work but later rescinded the termination when it was discovered that his absence was for medical reasons.  Further, Mr. Royer informed Tigerpoly that he would not

23

return to work until Monday, December 1, 2003 pursuant to doctor's orders. Tigerpoly provided Mr. Royer with Family Medical Leave Act paperwork for his doctor to complete. The note that Dr. Pachmayer sent to Tigerpoly stated, "off work til 11/24-11/30 Return Monday 11/30 Seen 11/21 + 11/24 with employers ok - to see urologist Has CT 12/10/03" (Dep. of Judith Watts, Ex. 11). Further, on December 3, 2003, Dr. Pachmayer completed the "Physician Certification for Family or Medical Leave." (Id. at Ex. 13). Although, on this form, which asked Dr. Pachmayer to give an opinion that:

> As a result of this condition, it is my opinion that:
> __ The Associate is currently unavailable to perform his/her job.
> __ The Associate is currently needed to care for his/her spouse, child, parent.
> __ Intermittent leave is medically necessary for the Associate.
> __ Intermittent leave is medically necessary for the Associate to care for his/her spouse, child, parent.
> __ None of the above.

Dr. Pachmayer selected "None of the Above," he also wrote "May due [sic] light duty until back specialist sees him." (Id.) The "Physician Certification" also indicated that Mr. Royer was not excused for any more days of work.

Tigerpoly claims that this case is similar to Woods v. DaimlerChrysler, 409 F.3d 984 (8th Cir.2005). In Woods, an employee was terminated for using leave that the employer deemed to be unprotected by the FMLA. The facts and analysis are best summed up by the Court of Appeals:

> In this case the district court granted summary judgment to DaimlerChrysler on the grounds that Woods had not shown that he gave adequate and timely notice that he needed FMLA leave. In analyzing that issue the district court focused on whether it was possible or practical for Woods to have given notice before he left work

24

on April 20 and whether his voicemail message
on April 23 was sufficient notice. ...

DaimlerChrysler did not deny Woods FMLA leave
or discharge him after his initial
communications. Instead, Michele Wyatt
prepared a report indicating that he was absent
due to an unknown illness and HR Manager Ron
Wander wrote him a letter indicating that his
absence was regarded as unsubstantiated and
that he should report immediately about it. If
he wanted FMLA leave, Woods had the
responsibility to give notice as soon as both
possible and practical that a serious health
condition caused his absence. DaimlerChrysler
was entitled under the FMLA to seek further
information with specific medical facts and
verification of its employee's request for
leave.

Wander's April 24 letter was sent after Woods
had left his two 6 a.m. voicemail messages
stating that he was seeing a doctor and would
be forwarding his note. In his letter Wander
cited Woods' unsubstantiated and unauthorized
absence from work on April 20 and his
responsibility to conform to the company
Standards of Conduct, and he also ordered Woods
to report to Wyatt by April 27. Even though
Woods received the letter by the reporting
deadline, he did not contact Michele Wyatt and
never provided substantiation of a need for
FMLA qualifying leave. Woods took no immediate
action to supplement his abbreviated voicemail
messages or the initial doctor note which only
mentioned "evaluation and treatment."

Woods chose to respond by writing Wander on
April 30 to say he had left work ten days
before because he was stressed and felt his
health was at risk, but he provided no
information to indicate that his absence was
due to a serious health condition. He also
failed to say when he would return to his
position, if it all, but only that he would
like to discuss a healthy and rewarding role
at the company. The enclosed second note from
Dr. Heidbrier merely stated that Woods had

25

been "advised to remain off work until 5/6/01," again offering no diagnosis and no mention of a serious health condition making him unable to perform the functions of [his] job.

During his appearance at the plant on May 7, Woods offered no additional information or substantiation to show his absence was because of a serious health condition making him unable to work. Even though he was given a letter on May 7 informing him that he was being suspended immediately until further investigation and that his continued employment turned on the outcome of that investigation, Woods failed to provide more information or verification about any serious health condition up to the time of his discharge on May 18. ...

Cases in which plaintiffs failed to make out an FMLA case for lack of adequate and timely notice are instructive here. Similar to the notes submitted by the unsuccessful plaintiff in *Bailey*, the doctor notes furnished by Woods did not specify any serious health condition preventing him from performing his work or the duration of his absence, and Woods presented no evidence that it would have been impracticable to provide more detailed information after he was notified by DaimlerChrysler that his absence was unsubstantiated. The notes Woods submitted merely said he was advised to remain off work without saying why and only referred to unspecified evaluation and treatment. Like the employee in *Carter*, Woods failed to comply with the employer's expressed need for information substantiating his absence and never informed DaimlerChrysler of any diagnosis or anxiety and depression. Woods is also like the employee in *Collins*, who did not provide her employer with information implying a serious health condition or an indication of when he would return to work. ...

Although he was given time to substantiate that he needed FMLA leave, he never submitted

26

> any verification that he had a serious health
> condition making him unable to perform the
> functions of his job.

Woods, 409 F.3d at 992-94.

Woods is similar to the case at bar to the extent that, like Mr. Woods, Mr. Royer, after missing work due to an injury, called his employer and left a voicemail that he would not be at work on Friday, November 21, 2003. Further, as in Woods, the doctor's note provided to Tigerpoly is vague and fails to indicate with any specificity the serious health condition preventing Mr. Royer from performing his job functions. This is where the similarities end, however. Unlike the plaintiff in Woods, Mr. Royer did provide his employer with additional information that verified he potentially had a serious medical condition making him unable to perform his job function. In other words, whereas in Woods, DaimlerChrysler continually requested information to substantiate the doctor's orders for missing work, which is permissible under the FMLA, Mr. Royer's physician completed the "Physician Certification for Family and Medical Leave."

On Mr. Royer's "Physician Certification for Family and Medical Leave," Dr. Pachmayer failed to check the box to indicate that "[t]he associate is currently unable to perform his/her task." Instead, the physician checked "None of the above" and wrote a note indicating that Mr. Royer "may due [sic] light duty until back specialist sees him." Because of this hybrid answer, and viewing the facts in a light most favorable to Mr. Royer, the Court cannot determine exactly what job functions Mr. Royer could or could not perform. Thus, the Court cannot make a determination whether Mr. Royer was suffering from a serious medical condition in order to qualify for FMLA leave.

According to Tigerpoly's job description of a Maintenance Tech I, which was Mr. Royer's title at the time of firing, Mr. Royer's

"typical day" consisted of hourly walking and standing. (Dep. of David Royer, Ex. Z). Further, Mr. Royer's job duties included frequent (defined as 1.5 to 5.5 hours per day) bending, stooping, reaching above his shoulder, kneeling, and pushing and pulling. (Id.) It also included occasional (defined as .25 to 2.5 hours per day) climbing, balancing, crawling, crouching, as well as lifting and carrying items over 120 lbs. (Id.)

It could be true that, given Mr. Royer's job duties, his "light duty" restriction would have precluded him from working within his job function. Conversely, a restriction to "light duty" might have allowed him to participate in nearly all of his job activities. At a minimum, however, because Mr. Royer was limited to "light duty," Tigerpoly had notice that Mr. Royer suffered from a health condition that had an impact on his ability to perform some work functions. It would have either known at that point that Mr. Royer's job was not ordinarily a "light duty" job or that some of his job duties may have been inconsistent with Dr. Pachmayer's certification. If there was an ambiguity at this point, Tigerpoly could have requested more information. See, e.g., Peter v. Lincoln Technical Institute, 255 F.Supp.2d 417, 444 (E.D. Pa. 2002)("Even if it is true that the notation "indefinite" does not satisfy [29 C.F.R. § 825.306(b)(2)(i)], the fact remains that the proper course of action for an employer who receives inadequate medical certification is not termination. Instead, such an employer is under an obligation to provide an employee with a reasonable time in which to correct or amend their certification"); Aboukora v. Keebler, Inc., No. 3:04-cv-0059, 2006 WL 839238 at *9-10 (M.D. Ga. March 30, 2006)(employer's motion for summary judgment denied because doctor's certification was ambiguous as to whether employee could perform job functions that would entitle him to FMLA leave).

Here, Tigerpoly apparently concluded that the generic phrase "light duty" meant that Mr. Royer was able to perform the functions

28

of his position and, therefore, denied FMLA leave.  However, given Mr. Royer's job functions as described in the Maintenance Tech I description, it could reasonably be inferred that "light duty" precluded Mr. Royer from performing these functions.  Accordingly, there are genuine issues of material fact surrounding whether Mr. Royer was entitled to take FMLA leave.  Should the jury conclude that Mr. Royer could perform his job function at Tigerpoly after his accident but missed work anyway, then his termination was justified because of the point accrual.  On the other hand, if a restriction to "light duty" prohibited Mr. Royer from performing his job function, Mr. Royer should have been allowed to take FMLA leave for missing work in November, and his subsequent termination was not justified.

IV.

Based on the foregoing, defendant's motion for summary judgment (doc. 17) is GRANTED to the extent of dismissing the employer intentional tort claim under Ohio law.  However, genuine issues of material fact surround the FMLA claim, and summary judgment is DENIED on that claim.

/s/ Terence P. Kemp
United States Magistrate Judge